UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LESLIE JAMES PICKERING,                                    DECISION
                                                                            and
                                          Plaintiff,                ORDER
                         v.
                                                                  19-CV-001F
U.S. DEPARTMENT OF JUSTICE,                           (consent)

                                          Defendant.
_____

APPEARANCES:            MICHAEL KUZMA, ESQ.
                                  Attorney for Plaintiff
                                  1893 Clinton Street
                                  Buffalo, New York  14206

                                  TRINI E. ROSS
                                  UNITED STATES ATTORNEY
                                  Attorney for Defendant
                                  MICHAEL S. CERRONE
                                  Assistant United States Attorney, of Counsel
                                  Federal Centre
                                  138 Delaware Avenue
                                  Buffalo, New York  14202


## JURISDICTION

On August 16, 2019, the parties to this action consented pursuant to 28 U.S.C.

§ 636(c) to proceed before the undersigned.  The matter is presently before the court on

Defendant's motion for summary judgment filed April 30, 2021 (Dkt. 23).


## BACKGROUND

Plaintiff Leslie James Pickering ("Plaintiff" or "Pickering"), commenced this action

pursuant to the Freedom of Information Act ("FOIA" or "the Act"), 5 U.S.C. § 552 *et seq*.,

on January 1, 2019, seeking an injunction and other relief, including the disclosure and

release of agency records withheld by Defendant United States Department of Justice ("DOJ"), and its component Federal Bureau of Investigation ("FBI"), responsive to a FOIA request made by Plaintiff.  The information Plaintiff seeks pertains to suspected investigations of one Leonard Peltier.  Defendant filed its answer on April 11, 2019 (Dkt. 7).  In the July 31, 2019 Scheduling Order (Dkt. 17) ("SO"), Defendant was directed to release non-exempt documents responsive to Plaintiff's FOIA Request by November 30, 2020, SO ¶ 3, and Plaintiff was directed to identify by December 15, 2020, his specific challenges to Defendants' FOIA determinations.  SO ¶ 4.  Between October 31, 2019 and November 30, 2020, the FBI made 12 interim releases in response to Plaintiff's FOIA Request ("FOIA Responses").  In accordance with the SO, on December 14, 2020, Plaintiff filed the affidavit of his attorney, Michael Kuzma, Esq. (Dkt. 19) ("First Kuzma Affidavit"), detailing Plaintiff's challenges to the various FOIA Responses.

On April 30, 2021, Defendant filed a motion for summary judgment (Dkt. 23) ("Defendant's Motion"), attaching the Declaration of Michael G. Seidel (Dkt. 23-1) ("Seidel Declaration"), with exhibits A through N (Dkt. 23 at 50-130) ("Defendant's Exh(s). __"), a Statement of Undisputed Facts (Dkt. 23-2) ("Defendant's Statement of Facts"), and a Memorandum of Law (Dkt. 23-3) ("Defendant's Memorandum").  Filed as Defendant's Exh. N (Dkt. 23-1 at 118-130) is the so-called "*Vaughn* Index" the requested government agency is required to furnish in responding to a FOIA request for records, purporting to identify each piece of information responsive to a FOIA request, as well as whether each responsive piece was released in full or in part, or withheld in

full as well as the asserted reason why any information was withheld either in full or in part. [1]

On June 2, 2021, Plaintiff filed the Memorandum in Opposition to Defendant's Motion for Summary Judgment (Dkt. 25) ("Plaintiff's Response"), attaching the Affidavit of Michael Kuzma, Esq. (Dkt. 25-1) ("Second Kuzma Affidavit"), with exhibits A through E (Dkt. 25-1 at 6-37) ("Plaintiff's Exh(s). __"), and Plaintiff's Statement of Undisputed Facts and Response to Defendant's Statement of Undisputed Facts (Dkt. 25-2) ("Plaintiff's Statement of Facts").  On August 13, 2021, Defendant filed in further support of summary judgment Defendant's Reply Memorandum of Law (Dkt. 28) ("Defendant's Reply"), attaching the Second Declaration of Michael G. Seidel (Dkt. 28-1) ("Second Seidel Declaration").  Oral argument was deemed unnecessary.

Based on the following, Defendant's Motion is GRANTED.

### **FACTS**[2]

Plaintiff is a proprietor of Burning Books ("Burning Books"), an independent book store located in Buffalo, New York ("Buffalo"), which Plaintiff describes as "specializing in social justice struggles and state repression."  Complaint ¶ 3.  Plaintiff is also a Political Science and Sociology Lecturer at Niagara University.  *Id*.  By letter dated February 17, 2018, Plaintiff, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, requested from the FBI all records related to Leonard Peltier ("Peltier")

---

[1] The "*Vaughn* Index" refers to an index prepared by the agency upon whom a FOIA request is made setting forth all materials otherwise responsive to the FOIA request but which the agency withholds as exempt from disclosure as well as the exemptions asserted as justifying the withholdings.  *See Vaughn v. Rosen*, 484 F.2d 820, 826-27 (D.C.Cir. 1973), *cert. denied*, 415 U.S. 977 (1974) (requiring government agency, in responding to FOIA request, prepare a list of documents withheld as exempt, either in full or in part, and furnish detailed justification for the asserted exemptions).

[2] Taken from the pleadings and motion papers filed in this action.

that were prepared, received, transmitted, collected or maintained by the FBI, the Terrorist Screening Center, the National Joint Terrorism Task Force, or any Joint Terrorism Task Force ("FOIA Request").  Plaintiff's FOIA Request was accompanied by the required DOJ Certificate of Identity, Form DOJ-361 ("Certificate of Identity forms"), completed with Peltier's information and signature.

In particular, the records Plaintiff seeks pertain to Peltier who, on June 26, 1975, was involved in a shootout with FBI Special Agents Jack R. Coler ("Coler") and Ronald A. Williams ("Williams") ("the Agents") on the Pine Ridge Reservation ("the reservation") in South Dakota ("the Pine Ridge shootout").  The Agents were on the reservation investigating a robbery when Peltier, a member of the American Indian Movement ("AIM"), and other AIM members, ambushed the Agents, both of whom were shot dead. Peltier was convicted of the Agents' murders but, although Peltier admitted firing at the Agents, he denied killing them and asserted someone else is responsible for the murders, yet refused to name such individual.  Peltier's conviction was upheld on appeal to the Eighth Circuit Court of Appeals, *United States v. Peltier*, 800 F.2d 772 (8th Cir. 1986), with the appellate opinion written by United States Circuit Judge Gerald W. Heaney ("Judge Heaney"), who also found that although the Government withheld favorable evidence from Peltier, the withheld evidence would not have created a reasonable probability of acquittal had it been disclosed and thus was insufficient to warrant vacating Peltier's conviction.  Second Kuzma Affidavit ¶¶ 15-16 (citing Plaintiff's Exh. D (Dkt. 25-1 at 15-17)).  Peltier, who was sentenced to two consecutive life sentences for the murders of the FBI Agents, remains incarcerated for the murders of the Agents at the United States Penitentiary in Coleman, Florida.

4

In 2002, Kuzma became aware that certain records maintained by the FBI pertaining to Peltier were being destroyed, prompting Kuzma to request their preservation by the National Archives and Records Administration ("NARA").  By letters dated February 20, 2003, and December 15, 2009, NARA advised Kuzma that certain records at FBI Headquarters were turned over to NARA for permanent preservation and the FBI field offices were instructed to identify and preserve case files and case file numbers pertaining to Peltier and the Pine Ridge shootout.  According to Plaintiff, because "[t]here remains a great deal of public interest in the Peltier case," Plaintiff's Response at 7, Plaintiff intends to make records responsive to the FOIA Request available online for researchers, writers, and others interested in the case, and Plaintiff intends to continue speaking about the case which demonstrates how the FBI targeted members of AIM, the Black Panther Party, and other groups under the FBI's "now discredited Counterintelligence Program (COINTELLPRO)."  *Id*.

With regard to Plaintiff's FOIA Request, on July 5, 2018, the FBI advised Plaintiff that approximately 6,020 pages of records responsive to the FOIA Request were located and reviewed, and discussed the fees associating with releasing the documents to Plaintiff.  By letter dated July 18, 2018, Plaintiff's counsel, Michael Kuzma, Esq. ("Kuzma"), advised the FBI that Plaintiff agreed to pay for the release of the records, and inquired when the 6,020 pages would be released.  By letter dated July 31, 2018, the FBI advised Plaintiff that FOIA requests are processed in the order received through a multi-track system, consisting of simple tracks (fewer than 50 pages of potentially responsive documents) and complex tracks (more than 50 pages of potentially responsive documents), with complex track requests further divided into medium, large,

and extra-large subtracts based upon their size.  The FBI further advised Plaintiff his FOIA Request was in the large track requiring more time to process and requested Plaintiff contact the FBI if Plaintiff desired to narrow his FOIA Request, which could result in shorter response processing time.  On January 2, 2019, Plaintiff commenced the instant action.

On March 6, 2019, the FBI modified its estimate of fees associated with the FOIA Request, advising Plaintiff the FBI located approximately 4,760 pages of records and audio and video files that the FBI determined were potentially responsive to Plaintiff's FOIA Request for which the anticipated fees could exceed $ 25.00.  By letter to the FBI dated May 30, 2019, Plaintiff narrowed the scope of the FOIA Request, stating that with the exception of "Subfile N"[3] Plaintiff was not requesting the FBI reprocess records that were the subject of prior FOIA litigation brought in the United States District Courts for the District of Minnesota and the Western District of New York, and further narrowed the FOIA Request to records generated after such FOIA litigation.[4]  Between October 31, 2019 and November 30, 2020, the FBI made 12 interim releases in response to Plaintiff's FOIA Request ("FOIA Responses"), totaling 5,253 pages of responsive records from which the parties, on January 22, 2021, agreed the FBI would randomly select 500 processed records containing withheld information, providing Plaintiff with justifications for exempting the withheld information from released documents.  The

---

[3] "Subfile N" includes documents processed with regard to a previous FOIA litigation commenced by Peltier.  Seidel Declaration ¶ 18.

[4] Prior to receiving from the FBI any documents responsive to his FOIA Request, Plaintiff filed two appeals with the DOJ's Office of Information Policy ("OIP"), claiming the FBI failed to timely respond to the FOIA Request, including on May 3, 2018, and on October 10, 2018 ("Plaintiff's appeals").  Both appeals were acknowledged by the OIP, which subsequently denied both appeals, advising Plaintiff that because the FBI had yet to made any adverse determination on Plaintiff's FOIA Request, there was no response for the OIP's consideration on Plaintiff's appeals.

*Vaughn* Index of the 500 randomly selected pages shows 342 pages were released in part ("RIP"), and 158 pages were withheld in full ("WIF") based on FOIA exemptions.

In connection with Defendant's pending motion, an explanation as to how Plaintiff's FOIA Request was processed is provided by Michael G. Seidel ("Seidel"), Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD").  According to Seidel, in fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency, the FBI compiles and maintains in the Central Records System ("CRS") records "consisting of applicant, investigative, intelligence, personnel, administrative, and general files . . . ." Seidel Declaration ¶ 20.  The CRS maintains records for the entire FBI organization including FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attached Officers ("Legats") worldwide.

CRS files are numerically sequenced and organized according to designated subject categories referred to as "FBI classifications."  As each FBI case file is opened, the file is assigned a Universal Case File Number ("UCFN") consisting of three sequential components including (1) the CRS file classification number; (2) the abbreviation of the FBI Office of Origin ("OO") initiating the file; and (3) the assigned individual case file number for that particular subject matter.  Within each case file, certain documents of interest are "serialized," *i.e.*, assigned a document number in the order in which the document is added to the file, typically in chronological order, referred to as "serials."

Records are located within the CRS through its general indices with the files alphabetized according to subject matter including individuals, organizations, events

and subjects of investigative interest.  Entries in the general indices fall into two categories including (1) a main entry created for each individual or non-individual, *i.e.*, an organization or other entity, that is the subject or focus of an investigation, and (2) a reference or "cross-reference" entry created for individuals or non-individuals associated with a case, but not the main subject or focus of an investigation.  Reference subjects typically are not identified in the case title of a file.  CRS indexing information is done by FBI investigators who have the discretion to deem information sufficiently significant to warrant indexing for future retrieval.  Thus, not every individual name, organization, event, or other subject matter is separately indexed in the general indices.

Initially, the indices for CRS files were manually maintained on paper index cards, filed alphabetically based on subject matter.  Later, many of the FBI's manual indices for FBIHQ and FBI field offices were automated into electronic databases.  Not all indexed data, however, was captured by automation; rather, automation pf FBIHQ manually indices captured indexed data on individuals born on or after January 1, 1958, and on organizations and events created or occurring on or after January 1, 1973.  Automation of FBI field offices' manual indices captured indexed data for individuals born on or after June 30, 1973, and on organizations and events created or occurring on or after June 30, 1988.

In 1995, Automatic Case Support ("ACS"), an electronic integrated case management system, was implemented with CRS records converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices.  Automation of FBI Legats' manual indices because with ACS on October 16, 1995 for indexed data on individuals born on or after

October 16, 1980, and for organizations and events created or occurring on or after October 16, 1995.  ACS searches were conducted through use of the Universal Index ("UNI") which provides an electronic means to search by indexing pertinent investigative information including such identifying information as name, date of birth, race, sex, locality, social security number, address, and date of an event.  On July 1, 2012, the Sentinel system ("Sentinel") became the effective FBI-wide case management system. Sentinel includes the same automated applications utilized in ACS, and also provides a web-based interface to FBI users.  Sentinel did not replace ACS, however, until August 1, 2018, when "ACS data was migrated into Sentinel, including the ACS indices data and digitalized investigative records."  Seidel Declaration ¶ 27.  Sentinel also retains the index search methodology and function whereby the CRS is queried via Sentinel for pertinent indexed main or reference entries in case files.  As such, CRS index data from the UNI application previously searched via ACS is now searched within Sentinel using the "ACS Search" function.

Accordingly, upon receiving FOIPA requests for information on subject matters predating implementation of Sentinel, RIDS begins its searching efforts by conducting index searches via Sentinel's ACS Search function, followed by an index search of Sentinel records to ensure any subsequent records or data relevant to the FOIPA request are located.  The CRS automated indices are updated daily with searchable material newly indexed in Sentinel.

In the instant case, upon receiving Plaintiff's FOIA Request, RIDS conducted CRS index searches for potentially responsive records employing the UNI application of ACS and the Sentinel automated indices, using as search terms "Leonard Peltier,"

"Lwonard Peltier," and "Leonard James Peltier" to search records maintained in FBIHQ and all FBI's field offices, identifying main and cross-referenced records.  Because Peltier was born before January 1, 1958, the FBI supplemented its ACS and Sentinel indices search with a search of pertinent manual indices for FBIHQ and applicable FBI field offices including Buffalo, Memphis, Oklahoma City, Omaha, Richmond, Los Angeles, Denver, Detroit, Birmingham, Minneapolis, San Juan, Sacramento, Portland, San Antonio, Charlotte, and Phoenix.

Each page of the records responsive to Plaintiff's FOIA Request is Bates-stamped.  The FBI provides a "*Vaughn* Index" listing a description of each document with the associated Bates-stamped page number, and a chart indicating for each record whether it was released in part, or withheld in full, as well as on which FOIA Exemption the FBI relies to support withholding the information.  The *Vaughn* Index in this case (Dkt. 23-1 at 118-130), is limited to the 500 sample pages to which the parties agreed, of which 342 were RIP and 158 were WIF.[5]  Of material withheld in full or in part, the FBI determined the withheld information was either exempt from disclosure pursuant to the cited FOIA exemption, or is so intertwined with exempt material that no information on the withheld pages could reasonably be segregated for release.

## DISCUSSION

**1.    Summary Judgment**

Defendant moves for summary judgment on Plaintiff's challenges to the adequacy of the FBI's FOIA Responses.  Summary judgment of a claim or defense will

---

[5] No pages in the *Vaughn* Index were released in full.

be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party, *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011), and summary judgment may not be granted based on a credibility assessment.  *See Reyes v. Lincoln Automotive Financial Services*, 861 F.3d 51, 55 (2d Cir. 2017) ("Adverse parties commonly advance conflicting versions of the events throughout a course of litigation.  In such instances on summary judgment, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." (citations, quotation marks, and brackets omitted)).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)). A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof. *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)). Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133,137 (2d Cir. 2009)).

In the instant case, Defendant argues in support of summary judgment that the FBI's search for records responsive to Plaintiff's FOIA Request was adequate, Defendant's Memorandum at 8-10, and the FBI's FOIA Responses were proper with regard to segregability, *id*. at 10-12, and the various asserted FOIA Exemptions. *Id*. at 12-22. In opposition, Plaintiff argues the FBI must release "reasonably segregable

information," Plaintiff's Response at 2-4, the FBI has not met its burden of proof for withholding information pursuant to FOIA Exemption 3, *id*. at 5, has improperly invoked Exemption 5, *id*., Exemptions 6 and 7(C) do not protect from disclosure the names of deceased individuals and retired FBI special agents, *id*. at 6-9, records withheld pursuant to Exemption 7(D) should be released, *id*. at 9-10, the FBI's claim of exemption under Exemption 7(E) should be rejected, *id*. at 10-13, and the FBI's search for records was inadequate.  *Id*. at 13.  Plaintiff further asserts he is eligible for an award of attorney fees and litigation costs incurred in connection with this action.  *Id*. at 13-14. In reply, Defendant argues the FBI's segregability review was proper, Plaintiff's Reply at 1-3, the FBI properly invoked the various FOIA Exemptions, *id*. at 3-9, the FBI's for records responsive to Plaintiff's FOIA Request was adequate, *id*. at 9-11, it is premature for the parties to litigate attorney fees, *id*. at 11-12, but if the court should consider such request, Plaintiff is not entitled to such an award.  *Id*. at 12-14.

2.    **FOIA Overview**

"The Freedom of Information Act adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies." *Halpern v. F.B.I.*, 181 F.3d 279, 286 (2d Cir. 1999) (citing cases).  "As noted by the Supreme Court, under FOIA, 'federal jurisdiction is dependent on a showing that an agency has (1) 'improperly' (2) 'withheld' (3) 'agency records.''"  *Grand Cent. Partnership, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (quoting *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1980) (quoting *Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136, 150 (1980))).  "Only when each

of these criteria is met may a district court 'force an agency to comply with the FOIA's disclosure requirements.'"  *Id*.

"[T]he strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents."  *United States Dep't of State v. Ray,* 502 U.S. 164, 173 (1991).  The agency has the initial burden to show it conducted an adequate search for responsive records.  *Carney v. United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir.), *cert. denied*, 513 U.S. 823 (1994).  A search is considered adequate if it was reasonably calculated to uncover all relevant documents, yet reasonableness does not demand perfection, and a reasonable search need not uncover every document extant.  *Grand Cent. Partnership, Inc.,* 166 F.3d at 489.

"The FOIA requires that agency records be made available promptly upon a request that 'reasonably describes such records and ... is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed.'"  *Ruotolo v. Dep't of Justice, Tax Division*, 53 F.3d 4, 9 (2d Cir. 1995) (quoting 5 U.S.C. § 552(a)(3)).  FOIA, however, exempts from disclosure nine categories of information.  5 U.S.C. § 552(b)(1) through (9) ("Exemption (b)(__)").  "Accordingly, to prevail on a summary judgment motion in a FOIA case, an agency must demonstrate 'that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements.'"  *Ruotolo*, 53 F.3d at 9 (quoting *Nat'l Cable Television Ass'n Inc. v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973)).  Furthermore, "'to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate.'"  *Id*. (quoting *Carney*, 19 F.3d at 812).

"'Affidavits submitted by an agency are accorded a presumption of good faith; accordingly, discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face.'" *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 36 F. Supp. 3d 384, 398 (S.D.N.Y. 2014) (quoting *Carney,* 19 F.3d at 812 (citation omitted)).  "'In order to justify discovery once the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate.'" *Id.* (citations omitted).

"Summary judgment is the preferred procedural vehicle for resolving FOIA disputes." *Bloomberg, L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 649 F.Supp.2d 262, 271 (S.D.N.Y. 2009).  "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Carney*, 19 F.3d at 812.  In contrast, "'[s]ummary judgment in favor of [a] FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption.'" *Nat. Res. Def. Council, Inc.*, 36 F.Supp.3d at 398 (quoting *NY. Times Co. v. U.S. Dep't of Def.*, 499 F.Supp.2d 501, 509 (S.D.N.Y. 2007)).  In resolving a summary judgment motion in a FOIA action, the district court conducts a *de novo* review of an agency's response to a FOIA request including any government records which the agency claims are exempt from disclosing. *See Lee v. F.D.I.C.*, 923 F.Supp.  451, 453 (S.D.N.Y. 1996) (citing 5 U.S.C. §

552(a)(4)(B); and *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361-62 (1976)).  Such

"*de novo* review requires the court to reweigh the evidence compiled by the agency to

determine whether the agency's findings are correct, not just whether they are

reasonable." *Id*. at 453-54.  Although FOIA authorizes *in camera* inspection of the

documents in question, it is not required.  *Id*. (citing 5 U.S.C. § 552(a)(4)(B)).

**3.    FOIA Request**

Defendant argues in support of summary judgment that the FBI's search for

records responsive to Plaintiff's FOIA request was adequate, Defendant's Memorandum

at 8-10, the FBI's FOIA Responses were proper, including with regard to segregability,

*id*. at 10-12, and the withholding of records pursuant to FOIA Exemption 3, *id*. at 12-14,

Exemption 5, *id*. at 14-16, Exemptions 6 and 7(C), *id*. at 16-19, Exemption 7(D), *id*. at

19-21, and Exemption 7(E), *id*. at 21-22.  In opposition, Plaintiff argues the FBI failed to

comply with its burden of establishing that documents withheld in full contain no

segregable information, *i.e.*, information that is not inextricably intertwined with the

exempt portions and which should have been released, Plaintiff's Response at 2-4, and

also failed to establish information was properly withheld pursuant to FOIA Exemptions

3, *id*. at 5, 5, *id*., 6(b) and 7(C), *id*. at 6-9, 7(D), *id*. at 9-10, and 7(E), *id*. at 10-13, and

the FBI's search of records responsive to the FBI's FOIA Request was inadequate.  *Id*.

at 13.  Plaintiff also seeks an award of attorney fees and litigation costs incurred in

connection with this action.  *Id*. at 13-14.  In further support of summary judgment,

Defendant argues the FBI's segregability review was proper, Defendant's Reply at 1-3,

the FBI properly invoked each of the FOIA exemptions on which the FBI relies in

withholding information, *id*. at 3-9, the FBI's search was adequate, *id*. at 9-12, and that

an award of attorney fees to Plaintiff would be premature until and unless Plaintiff "substantially prevails" in this action.  *Id*. at 12-14.

### A.    Adequacy of Search

In challenging the adequacy of Defendant's search for documents responsive to Plaintiff's FOIA Request, Plaintiff argues the burden is on Defendant to "demonstrate beyond material doubt" that the FBI "conducted a search reasonably calculated to uncover all relevant documents," Plaintiff's Response at 13, that a requested agency may not limit its search to only one record system if other systems are likely to reveal responsive records, *id*., and any doubt about the adequacy of a search should be resolved in favor of the requester.  *Id*.  Plaintiff maintains the inadequacy of the FBI's search is demonstrated by the fact the search returned no records pertaining to the FBI's interaction with Judge Heaney, *id*. and that although NARA placed a moratorium on records pertaining to Peltier, nothing in the Seidel Declaration indicates whether such records are being preserved.  *Id*.  In further support of summary judgment, Defendant argues that in responding to a FOIA request, an agency is not required to search every record system, Defendant's Reply at 9-10, that although the FBI located no records responsive to Plaintiff's FOIA Request referencing Judge Heaney, the details of the FBI's search as provided in the Seidel Declaration and the Seidel Reply Declaration establish the adequacy of the search which is not to be judged by the results, *id*. at 10-11, and whether the FBI is complying with the NARA's directive that the FBI preserve records pertaining to Peltier is irrelevant to the adequacy of the FBI's search for records responsive to the FOIA Request.  *Id*. at 11 n. 8.

"To secure summary judgment in a FOIA case, the defending agency must show through reasonably detailed affidavits or declarations that it conducted an adequate search and that any withheld documents fall within a FOIA exception." *Adamowicz v. I.R.S.*, 402 Fed.Appx. 648, 650 (2d Cir. 2010) (citing *Carney*, 19 F.3d at 812). *See Hodge v. F.B.I.*, 703 F.3d 575, 579 (D.C. Cir. 2013) ("In general, the adequacy of a search is 'determined not by the fruits of the search, but by the appropriateness of [its] methods.'" (quoting *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003))). Such affidavits are accorded "'a presumption of good faith,'" *id*. (quoting *Wilner v. NSA*, 592 F.3d 60, 69 (2d Cir. 2009)), "which 'cannot be rebutted by purely speculative claims about the evidence and discoverability of other documents.'" *Id*. (quoting *Grand Cent. P'Ship, Inc.*, 166 F.3d at 489. Significantly, "[a]n affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56(e); there is no need for the agency to supply affidavits from each individual who participated in the actual search." *Carney*, 19 F.3d at 814. Nor does the fact that additional records responsive to a FOIA request are not located and produced until after the plaintiff commences a FOIA action render the initial search insufficient. *Hodge*, 703 F.3d at 580 ("it does not matter than an agency's *initial* search failed to uncover certain responsive documents so long as subsequent searches captured them" (italics in original)). Furthermore, "the law demands only a 'relatively detailed and nonconclusory' affidavit or declaration." *Adamowicz*, 402 Fed.Appx. at 650-51 (quoting *Grand Cent. P'Ship, Inc.*, 166 F.3d at 488-89). Here, Defendant satisfies this standard by providing the Seidel Declaration and the Seidel Reply Declaration.

Specifically, Seidel avers that when Plaintiff filed his FOIA Request, Seidel, as RIDS Section Chief, was responsible for managing responses to requests for records and information pursuant to, as relevant here, FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, the FOIA Improvement Act of 2016, the Privacy Act of 1974, Executive Order 13,526, Presidential, Attorney General, and FBI policies and procedures, judicial decisions, and Presidential and Congressional directives.  Seidel Declaration ¶¶ 1-2.  In such capacity, Seidel is fully familiar with procedures followed by the FBI in responding to FOIA Requests, including the request filed by Plaintiff seeking records related to Leonard Peltier.  *Id*. ¶ 3.  Seidel recounts in detail the administrative history of the steps taken by the FBI in response to Plaintiff's FOIA request, *id*. ¶¶ 5-19, explaining the FBI's administrative process in searching for records responsive to the FOIA Request.  *Id*. at 20-43.  According to Seidel, RIDS policy, which was followed in processing Plaintiff's FBI FOIA Request, is to search for and identify "main" files responsive to most FOIPA requests at the administrative stage and, thus, RIDS also conducted a search of the CRS to locate any "reference" material potentially responsive to Plaintiff's FOIA Request.  *Id*. ¶ 34-39. The CRS search was done using the index search methodology including the FBI's automated indices available through Sentinel.  *Id*.  Such searches included variations of Peltier's name as per Plaintiff's FOIA Request.  *Id*. ¶ 36.  In total, the FBI identified 5,253 references responsive to Plaintiff's FOIA Request, of which 4,404 were released, in 12 interim releases, to Plaintiff either in full or in part.  *Id*. ¶ 19.

Because of its comprehensive nature and scope, CRS is the principal records system searched for records responsive to FOIA Requests concerning the FBI, and the

Sentinel and ACS indices would also be most likely to locate any electronic surveillance records ("ELSUR") responsive to such request.  Seidel Declaration at 33.  Seidel further explains that although Plaintiff specifically requested the FBI search other systems or locations for responsive records, including, *inter alia*, Laboratory Records, the "Bureau Mailing Lists," and surveillance databases, FOIA Request, Dkt. 23-1 at 51-54, because Plaintiff's FOIA Request seeks records pertaining to Peltier, who is a subject reasonably expected to be indexed within the automated indices available in Sentinel, and given the comprehensive nature of the information contained in the CRS, "the CRS is the FBI system of records where responsive records could reasonably be expected to be found."  *Id*. ¶ 39.  Significantly, the FBI is not required to search all records systems proposed by a requesting party, including those specified by Plaintiff in his FOIA Request, Dkt. 23-1 at 51-54.  *See Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C.Cir. 1990) ("There is no requirement that an agency search every record system," including each database specified by the requesting party).  Seidel also emphasizes that "RIDS search policy is grounded on the principle of reasonableness, not mere possibility, in the absence of information suggesting that records may be found elsewhere."  *Id*.  Nor has Plaintiff provided any information upon which RIDS could reasonably conclude records, including records pertaining to Peltier or Judge Heaney, would reside outside the CRS, *see Hodge*, 703 F.3d at 580 (rejecting FOIA plaintiff's challenge to adequacy of agency's search for records responsive to FOIA request where the plaintiff failed to identify additional searches the requested agency should have conducted and offered no basis for concluding additional documents might exist), and the information found from the CRS search did not indicate any additional records

would be located in the other systems Plaintiff identified.  Seidel Declaration ¶ 39.

These details provided in the Seidel Declaration, based on his personal knowledge and

experience working as RIDS Section Chief when Plaintiff's FBI FOIA Request was

processed, *Carney*, 19 F.3d at 814 (FOIA response requires affidavit from agency

employee responsible for FOIA requests), and which is both unrebutted and entitled to a

presumption of good faith, *Wilner*, 592 F.3d 69 (properly made and unrebutted affidavit

responding to FOIA request entitled to good faith presumption), sufficiently describe a

reasonable and thorough search of all databases relevant to Plaintiff's FBI FOIA

request, *Grand Cent. P'Ship, Inc.*, 166 F.3d at 488-89 ("the law demands only a

'relatively detailed and nonconclusory' affidavit or declaration").  Further, as Defendant

notes, Defendant's Reply at 11 n. 8, whether the FBI is complying with NARA's 2003

directive to preserve records pertaining to Peltier is not relevant to the question of the

adequacy of the FBI's search for records responsive to Plaintiff's FOIA Request, such

that Seidel could not be expected to comment on the issue.

Accordingly, the undisputed record establishes Defendant performed a

reasonable search for information, documents and records responsive to Plaintiff's FOIA

request.  Summary judgment regarding the adequacy of the FBI's search in response to

Plaintiff's FOIA Request thus is GRANTED with regard to Defendant's Motion.

**B.    Segregability**

Defendant asserts that after processing a total of 5,253 pages of records

responsive to Plaintiffs' FOIA Request, the parties agreed the FBI would randomly

select a sample of 500 pages of documents containing withheld information which set

consists of 342 pages released in part ("RIP"), and 158 pages withheld in full ("WIF").

Defendant's Memorandum at 11.  Defendant explains that the 342 pages RIP contain redacted information pursuant to FOIA Exemptions which were segregable from portions of the records that could be released without triggering foreseeable harm to any interest protected by the relevant FOIA exemptions.  *Id*.  With regard to the information that was WIF, Defendant explains that the information on the WIF pages was either fully covered by one or more FOIA exemptions, or was so intertwined with exempt material that "further segregation of the intertwined material would employ finite resources only to produce disjointed words, phrases, or sentences that, taken separately or together, would have minimal or no informational content."  *Id*. at 11-12. In opposing summary judgment, Defendant argues that the Seidel Reply Declaration provides additional information for the court to consider without conducting *in camera* review of the 158 pages WIF, Defendant's Reply at 2, and that further describing the withheld information would risk identifying the exempt information the FBI withheld as exempted under FOIA.  *Id*.

Insofar as Plaintiff urges the court to "conduct an *in camera* review of the pages withheld in full to determine whether or not there are any segregable portions," Plaintiff's Memorandum at 4, Congress left it in the court's discretion to determine whether or not to undertake *in camera* review.  *Military Audit Project v. Bush,* 418 F.Supp. 876, 879 (D.D.C. 1976).  Further, where the government agencies' affidavits on their face indicate the documents withheld logically fall within the claimed exemptions and there is no doubt as to the requested agency's good faith, the court should restrain its discretion to order *in camera* review.  *Lead Industries Ass'n, Inc. v. Occupational Safety and Health Administration,* 610 F.2d 70, 87-88 (2d Cir. 1979).  In the instant case, no *in camera*

review is required because the Seidel Declaration and the Seidel Reply Declaration objectively verify the FBI's asserted decision to deny disclosing entire pages of documents pertaining to Peltier.

In particular, Seidel avers the FBI identified 5,253 pages responsive to the FOIA Request, from which were randomly selected, in accordance with the parties' agreement, 500 pages of which 342 were RIP and 158 were WIF.  Seidel Declaration ¶ 101.  Seidel explains that the redactions to the 342 records RIP avoids triggering foreseeable harm to one or more interests protected by the FOIA exemptions.  *Id*. ¶ 101.a.  Seidel further explains with regard to the 158 pages WIF that additional segregation of "this intertwined information would employ finite resources only to produce disjointed words, phrases, or sentences that, taken separately or together, would have minimal or no informational content."  *Id*. ¶ 101.b.

"Disclosable information cannot be easily separated from that which is exempt without compromising the secret nature of the information."  *Doherty v. United States Dep't of Justice*, 775 F.2d 49, 52–53 (2d Cir. 1985).  As such, "that there may be some nonexempt matter in documents which are predominantly exempt does not require the district court to undertake the burdensome task of analyzing" withheld documents *in camera* in an uncertain effort to glean some potentially disclosable material.  *Id*. (citing *Lead Industries,* 610 F.2d at 88. *See also Weissman v. CIA,* 565 F.2d 692, 697–98 (D.C.Cir.1977)).

Here, the Seidel Declaration and the Seidel Reply Declaration provide an objective verification in support of the FBI's decision to deny disclosure of documents containing intelligence information and material pertaining thereto, as the FBI asserts.

In particular, Plaintiff has not come forward with any basis calling into question Seidel's explanation that the non-exempt information found on the 158 pages WIF of the random sample of 500 pages is "so intertwined with exempt information" that further segregation "would employ finite resources only to produce disjointed words, phrases, or sentences that taken separately or together, would have minimal or no informational content." Moreover, with regard to the segregability of the documents or lack thereof, "an agency's justification . . . is sufficient if it appears 'logical' or 'plausible.'" *N.Y. Times Co. v. U.S. Dep't of Justice,* 756 F.3d 100, 119 (2d Cir. 2014) (quoting *Wolf v. CIA,* 473 F.3d 370, 374-75 (D.C. Cir. 2007)).  Here, the FBI's asserted justification for failing to further segregate information for release appears both "logical" and plausible."  As such, there is no reason to put aside the good faith presumption afforded the FBI's explanation provided by Seidel.  *See Ramaci v. Fed. Bureau of Investigation*, 2021 WL 4896277, at * 10 (S.D.N.Y. Oct. 20, 2021) (holding FOIA plaintiff, by failing to counter affidavit by Seidel that further segregability would yield only sentence fragments that provided no information, also failed to overcome the presumption of good faith afforded to such affidavit); *Mermelstein v. U.S. Dep't of Justice, Fed. Bureau of Investigation*, 2021 WL 3455314, at *17 (E.D.N.Y. Aug. 4, 2021) (same).  As such, *in camera* review of these materials is not required.

Summary judgment therefore is GRANTED on Defendant's Motion pertaining to the segregation of information withheld in full.

### C.    FOIA Exemptions

The balance of Plaintiff's arguments regarding the FOIA Responses are predicated on the so-called "FOIA Exemptions" set forth in 5 U.S.C. § 552(b) as the

basis for redacting information from responsive documents or withholding their release altogether and "whether the agency has sustained its burden of demonstrating that the documents requested are . . . exempt from disclosure."  *Pub. Inv'rs Arbitration Bar Ass'n v. SEC*, 771 F.3d 1, 3 (D.C. Cir. 2014) (quoting *ACLU v. Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011)).  In particular, information responsive to Plaintiff's FOIA Request was withheld pursuant to 5 U.S.C. § 552(b)(3) ("Exemption 3), (b)(5) ("Exemption 5"), (b)(6) ("Exemption 6"), (b)(7)(C) ("Exemption 7(C)"), (b)(7)(D) ("Exemption 7(D)"), and (b)(7)(E) ("Exemption 7(E)"), and the court addresses the arguments raised with regard to each of these asserted exemptions.

### 1.    Exemption 3

The *Vaughn* Index prepared with regard to the 500 randomly selected pages responsive to the FOIA Request shows the FBI withheld, either in full or in part, many records pursuant to Exemption 3.  Dkt. 23-1 at 120-20.  According to Defendant, the FBI withheld pursuant to Exemption 3 information the FBI is obligated to protect by statute, specifically, the National Security Act of 1947 ("NSA"), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), 50 U.S.C. § 3024(i)(1). Defendant's Memorandum at 12-13.  In opposition, Plaintiff argues Seidel, on behalf of Defendant, "fails to adequately explain why the withheld information would reveal intelligence sources and methods."  Plaintiff's Response at 5.  In further support of summary judgment, Plaintiff maintains Seidel sufficiently explained that on its face, the NSA, as amended by the IRTPA, leaves agencies, including the FBI, without discretion about withholding from the public information pertaining to intelligence sources and

methods to avoid revealing information about national security investigations.

Defendant's Reply at 3-4 & n. 2 (citing *CIA v. Sims*, 471 U.S. 159 (1985)).

      As relevant here, Exemption 3 protects from disclosure information that is

> (3) specifically exempted from disclosure by statute . . . if that statute –
>     (A)(i) requires that the matters be withheld from the public in such a
>     manner as to leave no discretion on the issue; or
>     (ii) establishes particular criteria for withholding or refers to particular types
>     of matters to be withheld; and
>     (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009,
>     specifically cites to this paragraph.[6]

5 U.S.C. § 552(b)(3).

As relevant here, the NSA provides "[t]he Director of National Intelligence shall protect

intelligence sources and methods from unauthorized disclosure."  50 U.S.C.A. §

3024(i)(1) ("§ 3024(i)(1)").  As Seidel explains, on its face, the NSA leaves the Director

of National Intelligence ("DNI"), no discretion regarding the withholding from the public

information about intelligence sources and methods.  Seidel Declaration ¶ 45 (citing *CIA*

*v. Sims*, 471 U.S. 159 (1985).  To fulfill its obligation under the NSA to protect

intelligence sources and methods, the DNI has authority to establish and implement

guidelines for the Intelligence Community ("IC") for the classification of information

under applicable laws and Executive Orders for access to and dissemination of

intelligence.  *Id*. ¶ 46.  In accordance with this authority, "the DNI promulgated

Intelligence Community Directive 700, which provides that IC elements shall protect

'national intelligence and intelligence sources and methods and activities from

unauthorized disclosure."  *Id*. ¶ 46 & n. 13 (noting Intelligence Community Directive

(ICD) 700, dated June 7, 2012, at ¶ E.2.a).  Relevantly, "[t]he FBI is one of 17 member

---

[6] Because both the NSA and the IRTPA were enacted prior to the enactment of the OPEN FOIA Act of 2009, 5 U.S.C. § 552(b)(3)(B) does not apply.

agencies comprising the IC, and as such must protect intelligence sources and methods."  *Id.*  Defendant notes that "§ 3024(i)(1) does not impose a requirement to articulate harm," and that disclosure of intelligence sources and methods "presents a bona fide opportunity for individuals to develop and implement countermeasures, resulting in the loss of significant intelligence information, sources, and methods relied upon by national policymakers and the IC to safeguard the national security of the United States."  Seidel Declaration ¶ 47 n. 14.  Accordingly, Defendant maintains the FBI was without any discretion in withholding, pursuant to Exemption 3, material subject to the NSA.  *Id.* ¶ 47.  In opposing summary judgment, Plaintiff argues that Seidel fails to explain why the withheld information would reveal intelligence sources and methods related to national security.  Plaintiff's Response at 5 (citing *Open Society Justice Initiative v. CIA*, 505 F.Supp.3d 234 (S.D.N.Y. 2020) ("*Open Society*").  As Defendant argues in further support of summary judgment, however, *Open Society* is inapposite because it is limited to an agency's provision of a so-called "*Glomar*" response[7] to a FOIA Request in which an agency refuses to confirm or deny the existence of requested records because such acknowledgment could reveal the existence of information entitled to protection and, thus, the fact of an investigation potentially impairing national security.  Defendant's Reply7 at 3.

    When reviewing an agency's withholding pursuant to Exemption 3, two questions must be considered including: (1) whether the statute in question is a "withholding

---

[7] The *Glomar* doctrine provides "that an agency may, pursuant to FOIA's statutory exemptions, refuse to confirm or deny the existence of certain records in response to a FOIA request . . ., " where such confirmation or denial would reveal the existence of an investigation, a fact exempted from disclosure. *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 67 (2d Cir. 2009).

statute,"[8] and, if so, (2) whether the withheld material qualifies under that statute.  *CIA v. Sims*, 471 U.S. 159, 167 (1985).  Here, Plaintiff does not dispute that the NSA, the statute on which Defendant relies in withholding information pursuant to Exemption 3, qualifies as a withholding statute for purposes of FOIA.  *See, e.g.*, *Wolf v. CIA*, 473 F.3d 370, 373 (D.C.Cir. 2007) (acknowledging the NSA is an "exemption statute" as contemplated by Exemption 3).  Rather, Plaintiff asserts Defendant failed to adequately explain why the information the FBI withheld pursuant to Exemption 3 "would reveal intelligence sources and methods."  Plaintiff's Response at 5.  In further support of summary judgment, Seidel avers that information withheld pursuant to Exemption 3 "describes specific intelligence methods used by the FBI to obtain information related to national security investigations" and "[t]o further describe the withheld information on the public record would reveal the very information the FBI is obligated to protect."  Seidel Reply Declaration ¶ 7.

Significantly, within the context of national security, courts "'must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.'"  *Am. Civil Liberties Union v. Dep't of Justice*, 681 F.3d 61, 69 (2d Cir. 2012) (citing *Wolf*, 473 F.3d at 374).  In the instant case, Defendant, based on Seidel's averments in the Seidel Declaration and Seidel Reply Declaration, has sufficiently established Exemption 3 applies to information withheld as within the purview of the NSA, and Plaintiff has failed either to show Seidel's averments are made in bad faith, or to come forward with any tangible evidence showing Exemption 3 does

---

[8] A "withholding statute" or "exemption statute" refers to a statute for which Exemption 3 requires "particular types of matters to be withheld."  *Spadaro v. United States Customs & Border Prot.*, 978 F.3d 34, 43 (2d Cir. 2020).

not apply.  *See Carney,* 19 F.3d at 812 (requiring plaintiff make a showing of "bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate.").

Accordingly, Defendant's Motion is GRANTED with regard to information withheld from disclosure pursuant to Exemption 3.

### 2.   Exemption 5

The FBI withheld pursuant to Exemption 5 information asserted as protected from disclosure as, *inter alia*, attorney work product including inter-agency documents created at the direction of an attorney in reasonable anticipation of litigation. Defendant's Memorandum at 14-16.  In opposition to summary judgment, Plaintiff argues Defendant improperly invokes Exemption 5 because the withheld material does not meet the criteria for the "attorney-client" privilege.  Plaintiff's Response at 5.  In further support of summary judgment, Defendant argues Plaintiff does not challenge the information withheld pursuant to Exemption 5 as attorney work-product privilege but, rather, asserts the withheld information is not protected by the attorney-client privilege. Defendant's Reply at 4-5.

FOIA Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency . . . ."  5 U.S.C. § 552(b)(5).  Accordingly, to qualify for Exemption 5, a document must "satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."

*Dep't of Interior v. Klamath Water Users Protective Ass'n*., 532 U.S. 1, 8 (2001).

"Courts have interpreted Exemption 5 to encompass traditional common-law privileges against disclosure, including the work-product doctrine . . . ." *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005).  The work-product doctrine "prohibits one party in litigation from discovering from its adversary any 'documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative,' absent a showing of substantial need. Not only an attorney's mental impressions and opinions about a case but also the results of the attorney's factual investigations in anticipation of the case may constitute attorney work product."  *N.Y. Times Co. v. U.S. Dep't of Justice*, 939 F.3d 479, 489 (2019) (quoting *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183-84 (2d Cir. 2007)).

   In the instant case, Plaintiff does not deny the source of the information withheld pursuant to Exemption 5 is a government agency, *i.e.*, the FBI.  Nor does Plaintiff argue such withheld information is not within the ambit of the asserted privilege, here, the attorney work-product doctrine, but focuses, instead and perhaps erroneously, on the criteria applicable to the attorney-client privilege.  *See* Plaintiff's Response at 5. Nevertheless, a plain reading of the Seidel Declaration establishes that within the 500-page sample constituting the *Vaughn* Index, the FBI relied on Exemption 5 to justify withholding information including an FBI FD-302 interview form documenting the interview of a witness by an Assistant United States Attorney ("AUSA") and in the presence of FBI Special Agents concerning an FBI investigation."  Seidel Declaration ¶ 52.  Such information "satisfies Exemption 5's threshold because these records were exchanged inter-agency (*i.e.*, between the FBI and Executive Office for United States

Attorneys)." *Id*.  Seidel further avers the records "were created at the direction of the AUSA involved in criminal litigation reasonably anticipated to arise from the FBI's investigation," and "contains the specific terms agreed to by the witness's attorney and the AUSA," such that its release "would interfere with government attorneys' ability to properly prepare their legal theories and strategies and hinder them from providing the best possible representation for their client, the United States Government."  *Id*.  As stated, Plaintiff, by limiting his response in opposition to summary judgment to the criteria for the attorney-client privilege, provides no basis for challenging Defendant's explanation for withholding the information pursuant to Exemption 5 as attorney work-product.

Accordingly, summary judgment accordingly is GRANTED in favor of Defendant with regard to the information withheld pursuant to Exemption 5.

### 3. Exemptions 6 and 7(C)

FOIA Exemptions 6 and 7(C) are the asserted reasons for numerous redactions. *Vaughn* Index, *passim*.  In support of withholding information pursuant to these two exemptions, Defendant argues the FBI balanced the privacy interests of the individuals mentioned in the relevant records against any public interest in disclosure.  Defendant's Memorandum at 18-19.  Defendant further explains that because death typically obviates privacy concerns, in balancing such interests, the FBI considered whether the individuals for whom Plaintiff requested information were alive or dead.  *Id*.  In opposition, Plaintiff argues he is not interested in the names or identifying information of "third parties merely mentioned or of investigative intent," nor is Plaintiff seeking the identities of FBI professional staff or local law enforcement personnel; rather, Plaintiff

seeks only the names of certain retired FBI special agents who were either directly involved in the investigation of Peltier, or have taken steps to block Peltier's release from prison, as well as "the names of deceased individuals connected to Peltier." Plaintiff's Response at 6-9.  According to Plaintiff, "[t]here remains a great deal of public interest in the Peltier case," *id*. at 7, "Plaintiff has and will continue to share information released by the FBI with Peltier and the International Leonard Peltier Defense Committee," *id*., and Plaintiff "will continue to speak about the Peltier case and how the FBI has targeted members of AIM, Black Panther Party, and others under its now discredited Counterintelligence Program (COINTELPRO)."  *Id*.  According to Plaintiff, some of the retired FBI special agents maintained a "high profile" with regard to the Peltier case including maintaining blogs, speaking in public, and becoming involved in litigation with Peltier such that the agents "cannot hide behind the shield" of FOIA Exemptions 6(b) and 7(C).  *Id*. at 7-9.  In further support of summary judgment, Defendant argues Plaintiff references "no caselaw supporting the proposition that FBI special agents lose privacy protections just because they have retired or because they have a 'high profile' as Plaintiff terms it," and Plaintiff must demonstrate disclosure of such information will further FOIA's goals and avoid potential harm to the FBI. Defendant's Reply at 5.  Defendant also notes that pages containing the names of certain deceased individuals named by Plaintiff, including the now-deceased former FBI Agents assigned to the Peltier investigation, were inadvertently redacted in the FBI's FOIA Responses, and will be reprocessed and released to Plaintiff provided the

information contained therein is not further protected from disclosure pursuant to another FOIA exemption.[9]  *Id*. at 5 & n. 2.

As relevant here, FOIA Exemption 6 exempts from disclosure "personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  To determine whether identifying information may be withheld pursuant to Exemption 6, the court "must: (1) determine whether the identifying information is contained in 'personnel and medical files and similar files;' and (2) balance the public need for the information against the individual's privacy interest in order to assess whether disclosure would constitute a clearly unwarranted invasion of personal privacy."  *Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 291 (2d Cir. 2009) (citing and quoting *Wood v. F.B.I.,* 432 F.3d 78, 86 (2d Cir. 2005)).  "The determination of whether Exemption 6 applies requires balancing an individual's right to privacy against the preservation of FOIA's basic purpose of opening agency action to the light of public scrutiny."  *Id*. (citing *Dep't of the Air Force v. Rose,* 425 U.S. 352, 372 (1976) ("Exemption 6 does not protect against disclosure every incidental invasion of privacy—only such disclosures as constitute 'clearly unwarranted' invasions of personal privacy.")).  "'Only where a privacy interest is implicated does the public interest for which the information will serve become relevant and require a balancing of the competing interests.'"  *Id*. (quoting *Fed. Labor Relations Auth. V. U.S. Dep't of Veterans Affairs*, 958 F.2d 503, 509 (2d Cir. 1992)).  To prevail over the public interest in disclosure, "[a]n invasion of more than a *de minimis* privacy interest protected by Exemption 6 must be shown to be 'clearly unwarranted.'"  *Id*.

---

[9] The court expects such reprocessing and release if warranted will occur within 90 days.

"Under Exemption 6, therefore, the government's burden in establishing the required invasion of privacy is heavier than the burden in establishing invasion of privacy under Exemption 7(C)."  *Id*. (quoting *United States Dep't of State v. Ray,* 502 U.S. 164, 172 (1991).

FOIA Exemption 7(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy. . . .  5 U.S.C. § 552(b)(7)(C). Exemption 7(C) may be invoked where no public interest would be served by disclosure of information that implicates privacy interests.  *U.S. Dep't of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 775 (1989) ("*RCFP*") (denying disclosure of contents of FBI rap sheet to third party because the disclosure reasonably could be expected to constitute an invasion of personal privacy within the meaning of FOIA's law enforcement exemption).  In particular, in *RCFP*, the court determined that although there may be "some public interest in providing interested citizens with answers to their questions" about the subject of the FOIA request, such as deciding whether to offer the subject employment, to rent him a house, or to extend him credit, "that interest falls outside the ambit of the public interest that the FOIA was enacted to serve."  *RCFP*, 489 U.S. at 775.  "Thus whether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to "the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny,' rather than on the particular purpose for which the document is being requested."  *Id*. at 772 (quoting *Rose*, 425 U.S. at 372).

In the instant case, insofar as Defendant agreed to reprocess records responsive to Plaintiff's FOIA Request containing the names of now-deceased FBI Special Agents and to release such information provided the information is not exempt from disclosure pursuant to another FOIA Exemption, Defendant's Reply at 5 & n. 2, summary judgment is moot and the court considers only whether the FBI properly invoked Exemptions 6(b) and 7(C) to withhold pages responsive to the FOIA Request pertaining to the retired FBI Special Agents.

The Second Circuit Court of Appeals recognizes that government investigative personnel may be subject to harassment or embarrassment if their identities are disclosed. *Wood*, 432 F.3d at 78 (citing *Halpern v. FBI,* 181 F.3d 279, 297 (2d Cir.1999) (holding that FBI agents and other government employees have an interest against the disclosure of their identities to the extent that disclosure might subject them to embarrassment or harassment in their official duties or personal lives); and *Massey v. FBI,* 3 F.3d 620, 624 (2d Cir.1993) (same)).  Accordingly, "[t]his interest against possible harassment and embarrassment of investigative personnel raises a measurable privacy concern that must be weighed against the public's interest in disclosure."  *Id*.  When determining the public's interest in disclosure of a government employee's identity, several factors must be considered "including the employee's rank and whether the information sought sheds light on government activity."  *Id*. (citing *Perlman v. U.S. Dep't of Justice*, 312 F.3d 100, 107 (2d Cir. 2002) (applying a five-factor test where the government employee is the subject of an investigation), *vacated*, 541 U.S. 970 (2004), *reaffirmed*, 380 F.3d 110 (2d Cir. 2004)).

Although in the instant case, Plaintiff names books, a lawsuit, and other court proceedings in which several of the now-retired FBI Special Agents were involved to establish such agents "have maintained a high profile as it relates to the Peltier case," including Joseph H. Trimbach, Edward Woods, David Price, Larry W. Langberg, J. Gary Adams, Norman Zigrossi, and Rachel Held, Plaintiff's Response at 8-9, Plaintiff references no caselaw establishing such *public* involvement in tangential matters relative to Peltier's prosecution justifies releasing information pertaining to these individual's *private* involvement, in their occupational roles as Special Agents, in investigating Peltier with regard to the Pine Ridge shootout incident for which Peltier was prosecuted and remains incarcerated.  Nor does Plaintiff reference any authority for the novel proposition that the retirement of such individuals obviates the need for continued protection pursuant to Exemptions 6(b) and 7(C), and the court does not perceive how retirement renders irrelevant the need for former FBI Special Agents to maintain privacy in contrast to deceased agents whose privacy interests wane upon death.  Nor has Plaintiff cited any case supporting that the retired agents' "outspokenness" in their employment, working in retirement, and defending themselves in litigation involving Peltier will reveal the FBI's operations and activities, the only relevant public interest against which the retired agents' privacy interests must be weighed.  *See Wood*, 432 F.3d at 89 (citing *Ray,* 502 U.S. at 179; and *Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 174 (2004) (citing *Ray* and holding, pursuant to Exemption 7(C), "the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred")). Here, Plaintiff references no evidence of government wrongdoing that the retired FBI

Special Agents, in the course of investigating Peltier, were negligent or biased in the

performance of their duties.  Moreover, because Plaintiff is already in possession of the

names of the FBI Special Agents who investigated Peltier, such further disclosure,

without any indication of wrongdoing, would be a "clearly unwarranted invasion of

privacy," supporting the withholding of the information pursuant to Exemption 6 to FOIA.

Summary judgment with regard to information withheld pursuant to FOIA

Exemptions 6 and 7(C) is accordingly GRANTED.

### 4.    Exemption 7(D)

Information was redacted from several serials RIP or WIF pursuant to FOIA

Exemption 7(D) which exempts from disclosure

> [R]ecords or information compiled for law enforcement purposes, but only to the
> extent that the production of such law enforcement records or information . . . (D)
> could reasonably be expected to disclose the identity of a confidential source,
> including a State, local, or foreign agency or authority or any private institution
> which furnished information on a confidential basis, and, in the case of a record
> or information compiled by criminal law enforcement authority in the course of a
> criminal investigation or by an agency conducting a lawful national security
> intelligence investigation, information furnished by a confidential source . . . .

5 U.S.C. § 552(b)(7)(D).

According to Defendant, the information redacted pursuant to Exemption 7(D) in

response to Plaintiff's FOIA Request concerns a criminal investigation conducted by the

FBI and includes information pertaining to confidential sources.  Defendant's

Memorandum at 19-21.  In opposition, Plaintiff argues the FBI's assertion of Exemption

7(D) is unwarranted insofar as Defendant withheld information pertaining to several

individuals whose work as Confidential Human Sources ("CHSs") has been officially

confirmed, including Douglass F. Durham ("Durham"), Darlene Nichols-Ecoffey

("Nichols-Ecoffey"), who also use, respectively, the pseudonyms Sierra ("Sierra"), and

Maverick ("Maverick"), and one Serle Chapman ("Chapman").  Plaintiff's Response at 9-10; Second Kuzma Affidavit ¶¶ 23-25.  Plaintiff thus seeks the confidential source file numbers and confidential source symbol numbers[10] for these CHSs.  *Id*.  Plaintiff further maintains that because following the Pine Ridge shootout, Peltier fled to Canada where he was arrested on February 6, 1976, after the Canadian government cooperated with the FBI, the FBI was unwarranted in excising from the FOIA Responses information pertaining to Canada and its law enforcement agencies including the Royal Canadian Mounted Police.  *Id*. at 10.  In reply, Defendant argues that despite Plaintiff's assertion that Durham/Sierra, Nichols-Ecoffey/Maverick, and Chapman were government informants, Plaintiff's information fails to show the Defendant has officially acknowledged such individuals are confidential sources, Defendant's Reply at 6-7, and the information withheld by the FBI regarding the Canadian Mounted Police is not directly related to Peltier's arrest and extradition to the United States.  *Id*. at 7.

As discussed, Discussion, *supra*, at 14-15, 18, affidavits submitted by an agency regarding the agency's search for documents responsive to a FOIA request "are accorded a presumption of good faith" so long as such affidavits "are adequate on their face."  *Nat. Res. Def. Council, Inc.*, 36 F. Supp.3d at 398.  Further, once the agency has met its burden, to show that a claimed exemption should not apply or that summary judgment based on the affidavit is otherwise inappropriate, "the plaintiff must make a

---

[10] Confidential "source file numbers" and "source symbol numbers" refer to administrative tools that facilitate the retrieval of information, responsive to a FOIA request, supplied by a confidential source while further obscuring such source's identity.  Seidel Declaration ¶¶ 70-73.  Each confidential source file number is unique to a particular confidential source and is used only in documentation relating to that confidential source.  *Id*. ¶ 70.  When a confidential source reports information to the FBI on a regular basis pursuant to an express assurance of confidentiality, such source is considered a confidential human source ("CHS") to whom the FBI assigns a permanent source symbol number which the FBI then uses when referring to the CHS to obscure the CHS's identity.  *Id*. ¶¶ 70, 72.

showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence" contradicting the exemption's application. *Id.* (citations omitted).  In the instant case, Seidel avers the individuals whose identities and the information provided were withheld pursuant to Exemption 7(D) as CHSs was justified by the FBI's need to protect such sources and preserve the FBI's ability to recruit and maintain reliable sources to successfully investigate crimes.  Seidel Declaration ¶¶ 70-83.  Similarly, insofar as information pertaining to assistance from foreign governments was withheld pursuant to Exemption 7(D), the release of the identity of foreign government agencies, identity of their personnel, and information provided in confidence "could greatly harm the FBI's effectiveness in preventing or investigating violations of federal law."  *Id*. ¶¶ 84-86.

As Seidel explains, numerous confidential sources report to the FBI on a regular basis, providing information under the FBI's implied and express assurances of confidentiality and thus as "informants" within the common meaning of the term, *i.e.*, confidential sources as covered by Exemption 7(D), whereas others provide information pursuant to "implied assurances of confidentiality."  Seidel Declaration ¶ 68.  Under either set of circumstances, the sources providing the information are considered "confidential" because they provide information only with the understanding that their identities and the information they provide will not be divulged outside the FBI.  *Id*.  In this case, six different categories of information were withheld pursuant to Exemption 7(D) including (1) confidential source file numbers pursuant to Exemption 7(D)-1, Seidel Declaration ¶¶ 70-71; (2) confidential source symbol numbers pursuant to Exemption 7(D)-2, *id*. ¶¶ 72-73; (3) names and other identifying information of, and information

provided by, sources under an express assurance of confidentiality pursuant to Exemption 7(D)-3, *id*. ¶¶ 74-77; (4) names and other identifying information of, and information provided by, local law enforcement agencies pursuant to Exemption 7(D)-5, *id*. ¶¶ 78-80, (5) names and other identifying information of, and information provided by, individuals under an implied assurance of confidentiality pursuant to Exemption 7(D)-6, *id*. at 81-83; and (6) identifying information of an informant provided by foreign government agencies under an express assurance of confidentiality pursuant to Exemptions 7(D)-4 and 7(D)-7. *Id*. ¶¶ 84-86.  With regard to each of these six subcategories, Seidel emphasizes the need not to divulge information that could result in harassment or retaliation against the confidential sources by individual investigative subjects for whom they provided information that is critical to the FBI's investigations. Seidel Declaration ¶¶ 70-86.  Significantly, Plaintiff again fails to provide anything contradicting Seidel's averments regarding the critical need to withhold such information from disclosure to ensure the FBI continues to have access to information provided by the various confidential sources under express or implied assurances of confidentiality. *Nat. Res. Def. Council, Inc.*, 36 F. Supp.3d at 398.  Accordingly, summary judgment is GRANTED in favor of Defendant based on its withholding of information pursuant to Exemption 7(D).

### 5.    Exemption 7(E)

Information in several serials was redacted and withheld from disclosure pursuant to FOIA Exemption 7(E) which exempts

> [R]ecords or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or

prosecutions if such disclosure could reasonably be expected to risk circumvention of the law . . . .

5 U.S.C. § 552(b)(7)(E).

"Exemption (b)(7)(E) covers investigatory records that disclose investigative techniques and procedures not generally known to the public." *Doherty v. U.S. Dep't of Justice*, 77 F.2d 49, 52 & n. 4 (2d Cir. 1985). "The Second Circuit has explained that, as used in Exemption 7(E), a 'technique' is 'a technical method of accomplishing a desired aim' and a 'procedure' is 'a particular way of doing something or going about the accomplishment of something.'" *American Civil Liberties Union Foundation v. Dep't of Homeland Security*, 243 F.Supp.3d 393, 402 (S.D.N.Y. 2017) (quoting *Allard K. Lowenstein Intern. Human Rights Project v. Dep't of Homeland Security*, 626 F.3d 678, 681 (2d Cir. 2010)). "Accordingly, to invoke Exemption 7(E) here, the agency must justify its assertion that its practice . . . at issue in this motion actually shows a 'technique' or 'procedure' and that it is not already known to the public." *Id*. Nevertheless, "[w]hile the government retains the burden of persuasion that the information is not subject to disclosure under FOIA, 'a party who asserts that the material is publicly available carries the burden of production on that issue.'" *Inner City Press/Community on the Move v. Board of Governors of the Federal Reserve System*, 463 F.3d 239, 245 (2d Cir. 2006) (quoting *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1279 (D.C.Cir. 1992)). Somewhere within either the *Vaughn* Index or Defendant's affidavit, Defendant must provide, "a sufficiently specific link" between disclosing the particular withheld information and revealing how, and to what extent, the Defendant relies on such information in its investigations. *Island Film, S.A. v. Dep't of the Treasury*, 869 F.Supp.2d 123, 138 (D.D.C. 212). "'[I]t is well-established that 'an

agency does not have to release all details concerning law enforcement techniques just because some aspects of them are known to the public.'" *Kuzma v. U.S. Dep't of Justice*, 2016 WL 9446868, at *12 (W.D.N.Y. Apr. 18, 2016) (quoting *Bishop v. U.S. Dep't of Homeland Security*, 45 F.Supp.3d 380, 391 (S.D.N.Y. 2014)).  Moreover, "Exemption 7(E) sets a relatively low bar for the agency to justify withholding" and "only requires that the agency demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell v. F.B.I.*, 646 F.3d 37, 42 (D.C. Cir. 2011) (internal quotation marks, brackets, and citation omitted).

In the instant case, Defendant argues in support of summary judgment that the FBI withheld information pursuant to FOIA Exemption 7(E) "to protect non-public investigative techniques and procedures utilized by the FBI to conduct its law enforcement function, and to protect non-public details about techniques and procedures that are otherwise known to the public."  Defendant's Memorandum at 21-22.  In particular, the FBI invoked Exemption 7(E) to withhold sensitive investigation file numbers, collection and analysis of information including database information and search results, surveillance techniques, and monetary payments.  *Id*. at 22 (citing Seidel Declaration ¶¶ 89-100.  In opposition to summary judgment, Plaintiff clarifies he contests the FBI's reliance on Exemption 7(E) "to protect investigative database and database search results, surveillance techniques, and monetary payments."  Plaintiff's Response at 10-13.  In further support of summary judgment, Defendant argues Seidel has already sufficiently explained that providing the challenged information risks exposing the FBI's investigative techniques to criminals circumventing the law.  Defendant's Reply at 8 (citing Seidel Declaration ¶¶ 94-98).  With regard to information

concerning targets, locations, and types of devices used in surveillance operations used in investigation, Plaintiff argues such information should not be withheld when the investigations were improperly conducted, yet fails to point to anything indicating such investigation used illegal or unauthorized surveillance techniques, *id*. at 8, and that caselaw supports the FBI's withholding of information regarding monetary payments. *Id*. at 9.

With regard to the FBI's non-public database search results, Seidel avers in further support of summary judgment that the FBI withheld the identities of sensitive investigative databases used by the FBI for official law enforcement purposes, and the search results of such databases, and that releasing the identities of the databases or the search results would give criminals insight into the tools and resources available to the FBI to conduct criminal and national security investigations, such as the scope of information stored in the databases, how the FBI uses the databases to support its investigations, what information is most valuable to the FBI for particular investigations, and the databases' vulnerabilities.  Seidel Reply Declaration ¶¶ 13-14.  Disclosing search results would also provide criminals with an understanding of the scope of FBI-collected intelligence on particular subjects and expose possible intelligence gaps, which would allow criminals to exploit strengths and weaknesses and avoid detection or disruption by the FBI.  *Id*. ¶ 15.  Revealing the types of information stored in the databases would reveal what information is most useful to FBI investigators and permit criminals to deploy countermeasures depriving the FBI of useful intelligence or evidence, jeopardizing investigations.  *Id*.  Disclosing search results pertaining to a specific subject would alert criminals to the scope of FBI-collected information and

provide criminals with insight into the FBI's investigative strategies and the opportunity to corrupt or destroy information stored in the databases. *Id*. ¶¶ 15-16. Because the records show the FBI used a variety of non-public databases to support its investigations relating to Peltier, disclosing the identities of the databases and results stands to aid criminals, *id*. ¶ 17, such that release of the information relative to the FBI investigative databases would impede the FBI's effectiveness and aid in circumventing valuable investigative techniques. *Id*. ¶ 18-19. The court finds that Defendant, through the Seidel Reply Declaration, provides a sufficient explanation linking disclosure of the non-public databases and results of searches of such databases to the risk of circumventing the law such that the FBI properly withheld such information pursuant to Exemption 7(E).

With respect to the monetary payments requested by FBI personnel and paid by the FBI to implement particular investigative techniques, Seidel avers the FBI has limited resources it must strategically allocate to effectively pursue the FBI's mission and that revealing such payments would also reveal the FBI's level of focus on certain types of law enforcement and intelligence gathering efforts, thereby revealing the FBI's strategic allocation of its limited resources and identify the FBI's priorities within the spectrum of illegal activities the FBI investigates. Seidel Reply Affidavit ¶¶ 20-21. Seidel continues that releasing such information would enable criminals to structure their activity so as to manipulate the FBI's ability to focus on its investigative priorities, as well as reveal the FBI's budgetary limitations which may affect its investigations, thereby enabling criminals to circumvent the law. *Id*. ¶ 21. Here, Defendant has met the "low bar" of showing that disclosure of monetary payment information would create

the risk of circumvention of law such that the monetary payment information was properly withheld under Exemption 7(E).  *See Mermerlstein*, 2021 WL 3455314, at *15 (citing *Poitras v. Dep't of Homeland Sec.*, 303 F. Supp. 3d 136, 159 (D.D.C. 2018) (information reflecting monetary payments for investigative techniques were properly withheld under Exemption 7(E)).  Accordingly, the court finds the FBI properly withheld information pursuant to Exemption 7(E).

Summary judgment regarding information withheld pursuant to Exemption 7(E) is therefore GRANTED as to Defendant.

## <u>CONCLUSION</u>

Based on the foregoing, Defendant's Motion (Dkt. 23) is GRANTED.  The Clerk of Court is directed to close the file.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        December 7th, 2021
              Buffalo, New York